UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES AUSTIN,<br><br>                                          Plaintiff,<br><br>v.<br><br>R. BROWN, F. HADJADJ,<br>J. DAVIES and P. COVELLO,<br><br>                                          Defendants. | Case No.:  18cv0600-WQH (JLB)<br><br>**ORDER:**<br><br>**(1)  DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; AND**<br><br>**(2)  GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

        Plaintiff James Austin is a state prisoner proceeding pro se and in forma pauperis with a civil rights Complaint pursuant to 42 U.S.C. § 1983.  (ECF No. 1.)  He claims that while housed at the R. J. Donovan Correctional Facility ("RJD"), the free exercise of his religion was substantially burdened in violation of the First Amendment and the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA") by frequent cancellation of weekly Buddhist chapel services for lack of a volunteer supervisor due to Defendants' failure to provide a permanent supervisor, such as a Buddhist chaplain.[1]  (*Id*. at 9-34.)

---

[1]  All other claims in the Complaint, including equal protection, class action and state law claims, have been dismissed on Defendants' motion.  (ECF No. 24.)

Currently before the Court are Cross-Motions for Summary Judgment.  (ECF Nos. 37, 45.)   Plaintiff contends there is no genuine issue of material fact in dispute that Defendants are personally liable for the First Amendment and RLUIPA violations arising from the frequent cancellation of weekly Buddhist chapel services whenever a volunteer supervisor was unavailable, which substantially burdened the free exercise of his religious practices of mandatory indoor meditation, chanting, prostration and discussion of Buddhist dharma, because: (1) Defendant RJD Community Resources Manager Brown failed to stop the cancellations by hiring a Buddhist chaplain, assigning a permanent inmate volunteer minister, or requiring RJD staff to step in when supervisors cancelled, (2) Defendant RJD Chief Deputy Warden Covello and Defendant RJD Public Information Officer Davies were informed through the prison administrative grievance procedure of the violations and made assurances they would stop but failed to take the promised action, and (3) Defendant RJD Chaplain Hadjadj, a Jewish Rabbi, was assigned to supervise weekly Buddhist chapel services but failed to attend, resulting in their cancellation.  (ECF No. 37 at 1-18.)

Defendants contend there is no genuine issue of material fact in dispute that Plaintiff: (1) has failed to exhaust available administrative remedies, (2) has named improper Defendants because Defendant Brown cannot be held liable for ongoing violations since he has retired, Defendants Covello and Davies cannot be held liable merely for their roles in the inmate appeal process, and Defendant Chaplain Hadjadj did not direct, control or have any authority over religious services, and (3) was not substantially burdened in the exercise of his religion so as to amount to a violation of the First Amendment or RLUIPA because regular weekly access to the chapel for Buddhist services with volunteer leaders took place two out of every three weeks on average, with occasional cancellations due to holidays, weather, security, programming and absence of volunteer leaders, and because Plaintiff can perform his religious practices on the yard or in the housing unit when services are cancelled, as all other religions do when chapel services are cancelled, the hiring of a Buddhist chaplain, appointing a fulltime inmate minister, or reallocating RJD staff in order to prevent services from being cancelled for lack of a volunteer leader, are not reasonable

or necessary responses to the RJD polices of not permitting unsupervised chapel services and cancelling services when less than three inmates sign up.  (ECF No. 45 at 10-24.) Defendants also argue they are entitled to qualified immunity.  (*Id*. at 24-25.)

As set forth herein, the Court **DENIES** Plaintiff's Motion for Summary Judgment. The Court **GRANTS** in part and **DENIES** in part Defendants' Motion for Summary Judgment with respect to exhaustion of administrative remedies, and **GRANTS** Defendants' Motion for Summary Judgment with respect to Plaintiff's First Amendment and RLUIPA claims, the only claims remaining in this action.[2]

## I.    Plaintiff's Claims

Plaintiff claims in his Complaint that Defendants substantially burdened the free exercise of his religion in violation of the First Amendment "from 2016 to 2018 and now" when they denied him equal access to the prison chapel or similar place necessary to act as a Buddhist Temple where he and other inmates can practice Buddhist religious observances of mandatory indoor meditation, chanting, prostration and discussion of dharma.  (ECF No. 1 at 9-10, 22-30.)  He alleges Defendants could have prevented the frequent cancellations of weekly Buddhist chapel services for lack of a volunteer supervisor by hiring a fulltime Buddhist chaplain or a permanent volunteer leader, or by assigning RJD staff to supervise services whenever a volunteer was unavailable.  (*Id*.)  He claims his rights under RLUIPA were violated for those same reasons and because Defendants failed to expend funds necessary to purchase food for bi-annual Buddhist holiday festivals.  (*Id*. at 30-32.)

Plaintiff alleges Defendant RJD Chief Deputy Warden Covello is "the moving force behind" the policies which have violated those rights, and that he was made aware of the effect of those policies through the prison administrative appeal process but failed to ensure Buddhist religious observances were held every week.  (ECF No. 1 at 12.)  He alleges

---

[2] Although the motions were referred to United States Magistrate Judge Jill L. Burkhardt pursuant to 28 U.S.C. § 636(b)(1)(B), the Court has determined that neither a Report and Recommendation nor oral argument is necessary for the disposition of this matter.  *See* S.D. Cal. Civ.L.R. 72.1(d).

Defendant RJD Community Resources Manager Brown is the policy maker for all religious groups, including scheduling services, providing chapel access and approving religious items, was aware of the failure to accommodate Plaintiff's religious needs through inmate complaints and appeals filed by Plaintiff, and was instructed to take corrective actions to prevent cancellations but failed to do so. (*Id*. at 12-13.)

Plaintiff alleges Defendant RJD Chaplain Hadjadj is responsible for overseeing Buddhist services at RJD, including attending scheduled chapel services every Monday, but "does not show up for the scheduled services," which, in the absence of a volunteer leader or other supervisor, results in cancellation. (*Id*.) Finally, he alleges Defendant RJD "AA/PIO" Davies is in a position to order his subordinates, Defendants Chaplain Hadjadj and Brown, to ensure a supervisor is available to prevent cancellations but has not done so, despite giving assurances he would in his responses to inmate appeals. (*Id*. at 14.)

Plaintiff seeks: (1) a declaration that each Defendant has violated his rights as alleged in the Complaint, (2) an injunction compelling Defendants to: (a) allow all Buddhist inmates weekly chapel access, (b) provide Correctional Officers to cover weekly Buddhist services in the absence of a chaplain, and (c) provide mandatory chaplain supervision for weekly services and/or hire a Buddhist chaplain, and/or approve a permanent inmate minister; (3) nominal, presumed, punitive, and mental and emotional distress monetary damages, and (4) a Court visit to RJD to view the situation. (ECF No. 1 at 34-36.)

## II.    Summary Judgment Legal Standards

A moving party is entitled to summary judgment if they demonstrate "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the initial burden of "showing the absence of a genuine issue as to any material fact." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

18cv0600-WQH (JLB)

In order to avoid summary judgment, the nonmovant must present "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The Court may not weigh evidence or make credibility determinations, and any inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *Id*. at 255. The nonmovant's evidence need only be such that a "jury might return a verdict in his favor." *Id*. at 257.

## III. Exhaustion of Administrative Remedies

Defendants first contend that Plaintiff is unable to proceed with his claims in this Court because the undisputed evidence shows he has not exhausted available prison administrative remedies with respect to the claims presented in his Complaint because the only administrative appeal he filed prior to filing his Complaint involved Defendant Brown alone and was abandoned at the final level of appeal prior to complete exhaustion of administrative remedies. (ECF No. 45 at 11-13.) Although Plaintiff has not filed an opposition to Defendants' motion, he includes in his Complaint and his summary judgment motion an accounting of his prison administrative appeal filings, and argues he has done everything possible to resolve the claims presented here though the prison administrative appeal process to no avail, and therefore judicial intervention is necessary. (ECF No. 1 at 18-21, ECF No. 37 at 5-7.)

"The Prison Litigation Reform Act of 1995 (PLRA) mandates that an inmate exhaust 'such administrative remedies as are available' before bringing suit to challenge prison conditions." *Ross v. Blake*, 136 S. Ct. 1850, 1854-55 (2016) (quoting 42 U.S.C. § 1997e(a)). The "exhaustion requirement does not allow a prisoner to file a complaint addressing non-exhausted claims." *Rhodes v. Robinson*, 621 F.3d 1002, 1004 (9th Cir. 2010); *see also Jones v. Bock*, 549 U.S. 199, 204 (2007) (noting that the exhaustion requirement is based on an important policy concern that prison officials should have "an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court"); *Woodford v. Ngo*, 548 U.S. 81, 93-95 (2006) (holding that exhaustion often creates "an administrative record that is helpful to the court").

Inmates "are obligated to navigate all a prison's administrative review process 'regardless of the fit between a prisoner's prayer for relief and the administrative remedies possible.'" *Brown v. Valoff*, 422 F.3d 926, 935 (9th Cir. 2005) (quoting *Booth v. Churner*, 532 U.S. 731, 739-41 (2001)). Inmates are not required to exhaust administrative remedies when circumstances render administrative remedies "effectively unavailable." *Nunez v. Duncan*, 591 F.3d 1217, 1226 (9th Cir. 2010); *see also Ross*, 136 S. Ct. at 1862 ("The only limit to § 1997e(a)'s mandate is the one baked into its text: An inmate need exhaust only such administrative remedies as are 'available.'")

At the time of the events alleged in the Complaint, there were three levels of administrative review in the California Department of Corrections and Rehabilitation ("CDCR"). CAL. CODE REGS., tit. 15 § 3084.1(b) (repealed 2020). An inmate began the process by submitting, within thirty days of the adverse action, a CDCR form 602 inmate appeal describing the adverse action challenged. *Id*. § 3084.2(a), (c) (repealed 2020). If the inmate was not satisfied with the first level response, he or she was required to submit an appeal at the second level of review. *Id*. at § 3084.7(d)(2) (repealed 2020). If the inmate was not satisfied with the second level response, he or she was required to submit an appeal to the Office of Appeals for a third level of review by the Chief of the Office of Appeals in Sacramento, completing the exhaustion process. *Id*. at § 3084.7(d)(3) (repealed 2020).

On June 12, 2017, Plaintiff joined six other inmates in filing a group CDCR 602 inmate appeal which requested Defendant Brown, the RJD Community Resource Manager, to provide weekly chapel access or an alternate indoor space for Buddhist services, approve an inmate minister or provide for supervision of services if a chaplain or a volunteer was unavailable, and have the volunteer communicate directly with Defendant Brown or Defendant Chaplain Hadjadj. (ECF No. 45-8 at 6-10.) The appeal states:

> On May 13, 2017, I submitted a CDCR 22 form addressed to Robert Brown (CRM) regarding weekly Buddhist services chapel access being denied. This is a Citizen's Complaint against Robert Brown because this is the second unanswered CDCR 22 form both addressing weekly Buddhist services chapel access denied. Brown has a responsibility and duty to answer the CDCR 22

form within Title 15 CCR § 3086 time limits.  The Green sheet states inmates can file staff misconduct if staff does not respond.  Robert Brown knows of the clearly established First Amendment to the U.S. Constitution, and federal statute RLUIPA.  Brown personally participate[d] in the First Amendment deprivation by not providing a chaplain for supervision of weekly Buddhist services in the chapel that is required indoors.  Second, Robert Brown has not provided an alternative indoor area for weekly Buddhist services if chaplain is not available for supervision.  The same goes for Buddhist volunteers, he is not providing supervision if volunteers are not scheduled.

(*Id.*)

On July 21, 2017, Defendant RJD Correctional Lieutenant Davies "granted in full" that group appeal at the first level of review.  (*Id.* at 11-12.)  He stated: "The Buddhist volunteers have now been directed to communicate directly to R. Brown, CRM and Chaplain F. Hadjadj when they cannot attend, and Chaplain F. Hadjadj will be required to provide coverage for the services the volunteers cannot attend."  (*Id.* at 11.)

On July 25, 2017, one of the inmates who was a party to the group CDCR 602 appeal (the signature is illegible although Defendants contend it is Plaintiff) appealed that decision to the second level of review, stating he was "dissatisfied with the first level response because they have not made any mandatory Memo that implements Chaplain's supervision of Buddhist services, and other actions requested were not addressed.  We have not had weekly services for months.  To be exact over 6 months (2017)."  (*Id.* at 7.)

On August 24, 2017, Defendant RJD Chief Deputy Warden Covello responded at the second level of appeal stating: "The appeal is Granted."  (*Id.* at 13-14.)  He identified the action requested as: "That Buddhist inmates get a regular weekly service in the chapel," and stated:

After a review of Facility D Chapel Reports from 7/24/2017 to 8/21/2017 which is the last five weeks of services.  The Buddhist community had services and coverage by a chaplain or volunteer every week, except the week of 8/24/2017.  The institution is working in good faith to accommodate the Buddhist community on Facility D and will continue to monitor the weekly services.  Since the First Level Response services have been covered except for the one week due to staff being out.

(*Id.* at 13-14.)

On August 31, 2017, an inmate (again the signature is illegible but Defendants contend it is Plaintiff) appealed to the third level of review, stating: "On August 30, 2017, I received the appeal back, and [am] dissatisfied with the second level response." (*Id.* at 7.)   On October 17, 2017, Chief Appeals Coordinator M. Voong issued a third level response which stated in full (other than pre-printed form language): "Your appeal was granted at the institutional level.  There is no unresolved issue to be reviewed at the Third Level of review."  (*Id.* at 5.)  A pre-printed advisory on that form states:

> Be advised that you cannot appeal a rejected appeal, but should take the corrective action necessary and resubmit the appeal within the timeframes specified in CCR 3084.6(a) and CCR 3084.8(b).  Pursuant to CCR 3084.6(e), once an appeal has been cancelled, that appeal may not be resubmitted. However, a separate appeal can be filed on the cancellation decision.  The original appeal may only be resubmitted if the appeal on the cancellation is granted.

(*Id.*)

When seeking summary judgment based on a failure to exhaust, a defendant must prove there was an administrative remedy available to plaintiff which he did not exhaust. *Williams v. Paramo*, 775 F.3d 1182, 1191 (9th Cir. 2015).  If defendant does so, the burden shifts to plaintiff to come forward with evidence showing "there is something particular in his case that made the existing and generally available administrative remedies effectively unavailable to him."  *Id.*; *see Albino v. Baca*, 747 F.3d 1162, 1166 (9th Cir. 2014) (en banc) (holding that defendant is entitled to summary judgment if the undisputed evidence, viewed in the light most favorable to plaintiff, shows plaintiff failed to exhaust available administrative remedies (citing 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies *as are available* are exhausted." (emphasis added)))).

Defendants first argue Plaintiff had an obligation to continue with his appeal at the third level, and therefore had further administrative remedies available, because the third

18cv0600-WQH (JLB)

1  level decision was a "rejection" or "cancellation" of the appeal as a result of the pre-printed

2  advisory. (ECF No. 45 at 12.) However, Defendants present a declaration from the Acting

3  Chief for the Office of Appeals for the CDCR, A. Vasquez, who states that when an inmate

4  submits an appeal which does not comply with CDCR regulations and needs to be

5  resubmitted he is so notified *with the reasons for the cancellation*. (ECF No. 45-7 at 1-2.)

6  There is no evidence in the record Plaintiff was notified that his third level appeal was

7  defective and needed to be resubmitted, and even if the pre-printed advisory should be read

8  as stating as much, there is no evidence Plaintiff was informed of the *reasons* it was

9  defective, as the third level response does not do so and the box on the CDCR appeal form

10  which is used to indicate whether the appeal was rejected or cancelled is not checked.[3]

11       Defendants next argue Plaintiff was required to follow-up with respect to any issues

12  which were not resolved at the first or second levels of review, such as his dissatisfaction

13  that no memorandum was issued implementing the directives of the first level response, or

14

15  _____

16  [3]  The Court has previously found that another inmate who joined the group CDCR 602

17  appeal failed to exhaust administrative remedies. *See McCullock v. Brown, et al*., S. D.

18  Cal Civil Case No. 18cv0548-WQH (JLB), ECF No. 87 at 7-8.  In that case, however,

19  unlike here, the inmate also filed a separate CDCR 602 which was denied at the third level

20  review with a lengthy response from the CDCR Office of Appeals explaining why it was

21  defective, which was assigned Log No. RJD-18-00579, separate from the group appeal

22  which has Log No. RJD-17-03023. *See id*. The Court adopted the finding of the Magistrate

23  Judge that the third level response to the group appeal "was not a model of clarity" and did

24  not cure McCullock's failure to exhaust in light of the separate lengthy rejection he

25  received at the third level of review of his appeal on essentially the same issues, and the

26  Magistrate Judge recommended, in light of the lack of clarity as to the group appeal, that

27  the claims be denied on the merits, which this Court also adopted. *Id*. at 8-9.  In the present

28  case, by contrast, Defendants rely on the preprinted advisory on the third level review

    response and the same group CDCR 602 form which does not have the box checked

    indicating whether the third level appeal was rejected, cancelled or accepted, but which has

    a date stamp of October 12, 2017 on the line next to the unchecked "rejected" box. (ECF

    No. 45-8 at 7.)  Even if that indicates a rejection, Defendants have not presented a similar

    explanation from the Office of Appeals, *or any explanation at all* from that office, as to

    whether or why Plaintiff's third level appeal is insufficient and needed to be resubmitted,

    only the brief response stating that all issues were resolved. (ECF No. 45-8 at 5.)

1   that defendant Covello had misrepresented the record with respect to how many weekly

2   services were missed, or his need to further pursue other "actions requested [which] were

3   not addressed," and that any claim predicated on those issues remains unexhausted.  (ECF

4   No. 48 at 12, 15-16.)  Defendants note that on September 25, 2019, Plaintiff initiated a new

5   CDCR 602 appeal which was granted but which did not name any Defendant in this action

6   and did not proceed past the first level of appeal, and point out that any inmate grievance

7   procedures utilized after the Complaint here was filed cannot exhaust administrative

8   remedies as to any claim in the Complaint.  (*Id*. at 12-13.)

9       Plaintiff argues in his summary judgment motion that he filed numerous CDCR form

10   22s, which he describes as the sanctioned method for inmates to communicate with staff,

11   after the Complaint in this action was filed on March 22, 2016.  (ECF No. 37 at 5-7.)  He

12   also filed a CDCR 602 appeal on September 25, 2019, and argues he tried numerous times

13   after it was granted to resolve his issues through the inmate grievance procedure to no avail.

14   (*Id*.)  He argues that although his inmate appeals filed before he filed the Complaint in this

15   action were all granted, his post-Complaint CDCR appeals show that "no meaningful

16   Buddhist [a]ccommodations [were] ever realized."  (ECF No. 37 at 7.)

17       Based on this record, the Court finds Defendants have not satisfied their burden of

18   showing an administrative remedy was available to Plaintiff which he did not exhaust.  The

19   third level response to Plaintiff's appeal of the group CDCR 602 indicated that all issues

20   had been resolved at the institutional level, and the first and second level responses

21   indicated Plaintiff had received the relief he requested, namely, that a supervisor for weekly

22   services would be ensured to prevent cancellations.  The issues raised in those appeals

23   match the allegations in the Complaint here, that Plaintiff's rights under the First

24   Amendment and RLUIPA were violated because: (1) Defendant Brown failed in his

25   responsibility to ensure weekly Buddhist services were held by failing to ensure access to

26   the chapel or another suitable indoor area and failing to arrange for a chaplain or a volunteer

27   to supervise the services, (2) Defendant Chaplain Hadjadj failed to show up for weekly

28   services as directed which resulted in their cancellation when no volunteer leaders were

available, and (3) Defendants Covello and Davies allowed the violations to continue and in fact enabled them by granting the first and second level appeals without removing the barriers to weekly services or otherwise ensuring that the remedial steps they assured in their responses would be taken were taken.  There is, however, no mention contained in the group appeal of Plaintiff's additional RLUIPA allegation in his Complaint regarding Defendants' refusal to pay for food for bi-annual Buddhist holiday festivals.  Thus, with respect to that aspect of his RLUIPA claim, the Court finds Defendants have carried their burden on summary judgment to show there was an administrative remedy available to plaintiff which he did not exhaust.  *Williams*, 775 F.3d at 1191.

As to Plaintiff's remaining claims, even if Defendants could establish Plaintiff did not technically satisfy the administrative procedure requirements by failing to construe the third level adjudication stating that all issues had been resolved at the lower levels as a requirement that he resubmit the third level appeal, with, for example, an argument as to why all his issues had not been resolved to his satisfaction, or, as Defendants alternately contend, because he did not adequately assert that any Defendant other than Defendant Brown was responsible for the denial of his rights, there are "circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief."  *Ross*, 136 S. Ct. at 1859.  One such circumstance arises when the exhaustion procedure "operates as a simple dead end - with officers unable or consistently unwilling to provide any relief to aggrieved inmates."  *Id.* at 1859-60.

Plaintiff clearly sought to address the issues he raises in his Complaint here though the prison administrative appeal proceedings, namely, that Buddhist services are not consistently held on a weekly basis due to the Defendants' failure to keep their promise to ensure a supervisor would be available to prevent routine cancellation of weekly services for lack of a supervisor.  He was granted relief at the first two levels of review and informed at the third level he had obtained relief.  The declaration of A. Vasquez, the Acting Chief for the Office of Appeals for the CDCR, states that when an inmate submits an appeal which does not comply with CDCR regulations and needs to be resubmitted he is so

notified with the reasons for the cancellation.  (ECF No. 45-7 at 1-2.)  As discussed above, however, there is no evidence in the record Plaintiff was ever informed his third level appeal was defective, or provided reasons explaining its deficiencies.  Thus, even to the extent Defendants could establish Plaintiff had additional administrative remedies remaining after the third level response, in light of the fact that all his inmate appeals were granted but he allegedly never obtained the relief they promised, which would have cured the violations of his rights as alleged in his Complaint, and any notification of a defect in the appeals process is absent from the record, Defendants have not carried their burden of showing additional administrative remedies were "available" to Plaintiff.  *Ross*, 136 S. Ct. at 1859-60.

The Court **GRANTS** in part and **DENIES** in part Defendants' Motion for Summary Judgment with respect to their contention that Plaintiff cannot bring this action against them because he has failed to exhaust available administrative remedies.   Summary judgment is granted to the extent Plaintiff claims to have been denied food for Buddhist holiday festivals in violation of RLUIPA, but denied with respect to all other claims.

**IV.   First Amendment Claim**

Both parties seek summary judgment on Plaintiff's First Amendment claim alleging Defendants substantially burdened the free exercise of his religion "from 2016 to 2018 and now" when they denied Plaintiff access to the prison chapel or similar place necessary to act as a Buddhist Temple where he and other inmates can practice Buddhist religious observances of mandatory indoor meditation, chanting, prostration and "discussion of dharma talk, or Buddhist talk," by failing to prevent frequent cancellations by hiring a fulltime Buddhist chaplain or a permanent volunteer inmate minister/leader, or by assigning RJD staff to supervise services when a volunteer was unavailable.  (ECF No. 1 at 9-10, 22-30.)

Defendants contend the claim fails because: (1) Plaintiff's religious practices were not substantially burdened when chapel services were cancelled because he was still able to meditate indoors in the housing unit and discuss the dharma with other inmates; (2) his

requests for a fulltime Buddhist chaplain, appointment of an inmate minister, or for CDCR staff to step in when a supervisor is not available, are unreasonable and unnecessary to the free exercise of his religion; and (3) the RJD policies cancelling weekly services when less than three inmates sign up for services and when no supervisor is available are reasonably related to important penological interests of security and efficient utilization of prison resources.  (ECF No. 45 at 17-24.)

Plaintiff contends there are no genuine issues of material fact in dispute that he informed Defendants through the prison administrative grievance procedures that he and other Buddhist inmates were being deprived of the free exercise their religion in violation of the First Amendment by cancellation of weekly chapel services whenever a supervisor was unavailable.  (ECF No. 37 at 1-18.)  He claims entitlement to summary judgment because Defendants could have cured this violation, and still can, by hiring a permanent Buddhist chaplain, assigning a permanent inmate volunteer minister, or requiring RJD staff to supervise services when a supervisor is not otherwise available.  (*Id*.)

Prisoners retain their First Amendment rights to free exercise of religion while incarcerated.  *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987), *superseded on other grounds by* Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb *et seq.*, *as stated in Ashelman v. Wawrzaszek*, 111 F.3d 674 (9th Cir. 1997); *see Bell v. Wolfish*, 441 U.S. 520, 545 (1979) (Prisoners "do not forfeit all constitutional protections by reason of their conviction and confinement in prison").  To warrant protection under the First Amendment, religious belief must be "sincerely held" and "rooted in religious belief," rather than in secular philosophical concerns.  *Malik v. Brown*, 16 F.3d 330, 333 (9th Cir. 1994) (citations omitted); *Callahan v. Woods*, 658 F.2d 679, 683 (9th Cir. 1981).  That aspect of this case is not in dispute.

What is in dispute with respect to Plaintiff's First Amendment claim is whether prison regulations or official acts impinged on his constitutional right to the free exercise of his religion.  They do not if they are "reasonably related to penological interests." *Shakur v. Schriro*, 514 F.3d 878, 884 (9th Cir. 2008).  Both parties recognize that such a

determination is made through the test outlined in *Turner v. Safley*, 482 U.S. 78 (1987), *superseded on other grounds by* RFRA *as stated in Ashelman*, 111 F.3d 674, which requires the Court to balance four factors in determining whether a prison regulation is reasonably related to legitimate penological interests: (1) whether there is a valid rational connection between the prison regulation and the legitimate government interest put forward to justify it; (2) whether there are alternative means of exercising the right that remain open to prison inmates; (3) whether accommodation of the asserted constitutional right will impact guards and other inmates or prison resources generally; and (4) whether there is an absence of ready alternatives versus the existence of obvious, easy alternatives. *Shakur*, 514 F.3d at 884, citing *Turner*, 482 U.S. at 89-90.  In conducting this analysis, courts are to give significant deference to the views of prison officials in light of the "inordinately difficult" nature of prison operation.  *Turner*, 482 U.S. at 84-85.  Moreover, while "[t]he exercise of discretion . . . may produce seeming 'inconsistencies,' . . . inconsistent results are not necessarily signs of arbitrariness or irrationality." *Thornburgh v. Abbott*, 490 U.S. 401, 416 n.15 (1989).

Plaintiff argues in his summary judgment motion that the *Turner* factors tilt in his favor because: (1) the failure to ensure weekly services are not routinely cancelled is the result of deliberate acts of avoidance, misdirection and insincerity by Defendants regarding the resolution of the issues causing the cancellations; (2) the chapel is the only suitable place to hold services; (3) Defendants have not explored alternate avenues to reduce or eliminate the cancellations; and (4) the impact on RJD or CDCR staff to accommodate Plaintiff's requests is non-existent or negligible, as any costs would be de minimis.  (ECF No. 37 at 11-12.)  Defendants argue summary judgment is appropriate in their favor because: "(1) Defendants have not substantially burdened Plaintiff's alleged religious belief because he can still meditate indoors and discuss the dharma with other prisoners; (2) Plaintiff's desired accommodations of a fulltime Buddhist chaplain, fulltime volunteer, or the appointment of an inmate minister are unreasonable and not required by the Free Exercise Clause; and (3) Donovan's policies that religious chapel services must be

supervised and services are only arranged at the request of three or more inmates are valid under the *Turner* factors, and therefore occasional cancellations do not violate the Free Exercise Clause."  (ECF No. 45 at 17-18.)

The first *Turner* factor, which the Ninth Circuit has indicated is the most important, *see Morrison v. Hall*, 261 F.3d 896, 901 (9th Cir. 2001), asks whether there is a "rational connection" between the regulation and the proffered governmental interest used to justify the regulation.  *Turner*, 482 U.S. at 89.  "[A] regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational."  *Id*. at 89-90.

Defendants admit that Plaintiff did not always have chapel access every week, but contend the cancellations were caused by the RJD policies: (1) permitting chapel access to inmates only when supervision is available, and (2) allowing religious services in the chapel only when three or more inmates request them, both of which apply to all religions. (ECF No. 45 at 19-21.)  They contend that because Plaintiff does not dispute that he is able to practice his religion by meditating, chanting, prostrating and discussing the dharma in his cell, his housing unit, or any other indoor space available to him with whomever he chooses when cancellations occur, these policies do not substantially burden the free exercise of his religion within the meaning of the First Amendment, and there is therefore no need to accommodate his requests to ensure weekly group worship services are never cancelled by hiring a fulltime Buddhist chaplain, appointing a permanent inmate volunteer, or ensuring a volunteer or CDCR staff are available to supervise group worship every week. (*Id*.)

Plaintiff presents as exhibits to his summary judgment motion documents which he contends show that progress in reducing the cancellation of weekly Buddhist services in the prison chapel due to a lack of a supervisor has not been made since this case was initiated, including copies of CDCR form 22s he has used to point out the issues.  (ECF No. 37 at 46-81.)  He also includes copies of the chapel calendar for five months in 2019 indicating that weekly Buddhist services were not always scheduled.  (*Id*. at 39-44.)

Defendants submit as Exhibit A to their summary judgment motion reports on the weekly chapel services held or cancelled on D-Yard from July 25, 2016, through April 29, 2019 (ECF No. 45-5 at 1-141), authenticated through the declaration of J. Giurbino, the RJD Litigation Coordinator (ECF No. 45-4 at 1-2), which they assert shows Buddhist services were held two out of every three weeks on average during that period.  (ECF No. 45 at 24.)  Those documents show that during those 139 weeks, weekly Buddhist services were held 93 times (68%) and cancelled 44 times (32%), with 2 instances where it is unclear from the documents whether service was held.  (ECF No. 45-4 at 3-141.)  Of the 44 cancellations, 28 were due to "no show," 7 were due to holidays, 4 to "no program," 3 to "no service," and 1 each to weather and "no list."  (*Id.*)  Accordingly, it appears that during that period, a little over two and one-half years, at most 35 weekly services (25% of all services, or one each month) were cancelled due to the lack of a supervisor or lack of interest by more than three inmates.

Defendants submit the declaration of R. Kroll, who states that he works at RJD as an Associate Government Program Analyst within the Community Resources Department, and that it is his job to monitor inmate programs, including oversight of RJD chaplains who monitor religious services.  (ECF No. 45-6 at 1.)  He states that RJD has policies of scheduling chapel services only when three or more inmates indicate interest and requiring anyone using the chapel to be supervised by a chaplain, religious volunteer or other CDCR staff.  (*Id.* at 2.)  He states that services are cancelled if a chaplain, religious volunteer or other CDCR staff are not available, and that cancellations may also be caused by holidays, weather, prison security and program issues.  (*Id.*)  He states that the policy of requiring a minimal amount of interest in a chapel service, three or more inmates, ensures that RJD's resources are used efficiently.  (*Id.*)

Finally, Defendants submit the declaration of Defendant Brown, who states that he worked as the RJD Community Resources Manager from September 1, 2014 to January 31, 2018, when he retired, and his duties included coordinating, monitoring and supporting RJD's religious programs in accordance with CDCR regulations and Operations Manuals.

(ECF No. 45-3 at 1.)  He states that he tried to recruit people to volunteer at RJD, including Buddhist volunteers, by speaking directly to religious groups in the community and informing them of volunteer opportunities, by requesting chaplains employed at RJD to use their contacts to identify potential volunteers, and by encouraging inmates to let him know of anyone interested in becoming a volunteer.  (*Id*. at 1-2.)  He states that he did not have the authority to appoint an inmate minister and therefore did not deny, and could not have denied, Plaintiff's request to do so, and the Warden has that authority under CDCR Operations Manual § 101060.63.  (*Id*. at 2-3.)  Defendant Brown states he did not have authorization to permit unsupervised chapel services or require a chaplain or CDCR staff to supervise services.  (*Id*. at 2.)  He states that volunteers scheduled to supervise religious services sometimes cancel at the last minute or simply do not show up, and when that occurs it is very difficult to find CDCR staff to supervise chapel service on short notice, which usually resulted in cancelled chapel service, which were then held on the yard where CDCR staff were already present, which was true of all religions, not just Buddhist services.  (*Id*.)  He states that mandatory supervision of religious services in the chapel serves important penological goals because based on his personal experiences such services have in the past been used by inmates to pass contraband and facilitate gang activities away from the observation of CDCR staff on the yard or in the housing units.  (*Id*.)  Finally, Defendant Brown states that "religious services provide a unique opportunity for inmates to advocate for radical or inflammatory positions that would otherwise not be permitted, and create concerns of planned riots and organized violence.  Therefore, in order to ensure the safety of inmates and staff, the rule at Donovan was that access to the chapel was not permitted without supervision by either an employed chaplain, religious volunteer, or other CDCR staff.  This rule ensured that custody staff could be summoned with an alarm if necessary, and that any misconduct would be reported."  (*Id*.)

Based on this testimony, the Court finds Defendants have shown a "valid, rational connection" between RJD's policy of requiring supervision of chapel services for any religious service and a legitimate penological interest in institutional safety.  *See*

*Thornburgh*, 490 U.S. at 415 (holding that it is "beyond question" that regulations "expressly aimed at protecting prison security" are legitimate, as this purpose is "'central to all other correctional goals'" (quoting *Pell v. Procunier*, 417 U.S. 817, 823 (1974))). In addition, there is evidence in the record that the policy of requiring a minimal interest in a chapel service, three or more inmates, before allowing the scheduled weekly service to take place, serves a non-arbitrary goal of efficiently utilizing prison resources. *See Turner*, 482 U.S. at 89-90 ("[A] regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational.").

Accordingly, with respect to the first *Turner* factor, which is the most important, Defendants have, and Plaintiff has not, carried the initial burden on summary judgment of "showing the absence of a genuine issue as to any material fact" as to whether there is a "rational connection" between the regulation and the proffered governmental interest used to justify the regulation. *Adickes*, 398 U.S. at 157. Plaintiff has failed to carry his burden in opposition to Defendants' summary judgment motion to present "specific facts showing that there is a genuine issue for trial" as to this factor. *Anderson*, 477 U.S. at 256.

The second *Turner* factor focuses on whether there are "alternative means of exercising the right" by the inmate. *Turner*, 482 U.S. at 90; *O'Lone*, 482 U.S. at 351-52. "The relevant inquiry under this factor is not whether the inmate has an alternative means of engaging in the particular religious practice that he or she claims is being affected; rather, [the Court must] determine whether the inmates have been denied all means of religious expression." *Ward*, 1 F.3d at 877.

Plaintiff does not dispute he was not denied "all means of religious expression," but contends he was denied the opportunity to engage in group worship in the chapel or similar temple-like area which he claims is "needed to improve meditation with the assistance of other Buddhist practitioners[,] [i]ncluding, but not limited to, discussion of dharma talk, or Buddhist talk." (ECF No. 1 at 24.) Defendants have presented evidence that when weekly services have been cancelled under the policy requiring a supervisor, slightly less than once

a month for the 139-week period from July 25, 2016, through April 29, 2019, or due to the lack of sufficient fellow Buddhist inmate interest, Plaintiff was free to hold services outside on the yard or inside in the housing unit.  Defendants have also presented evidence showing that all religions hold services on the yard or in the housing unit when chapel service is cancelled or the chapel is unavailable for any reason.  Plaintiff contends that worship on the yard or another indoor space is more difficult for Buddhists because it disrupts meditation and because there is no one to discuss the dharma with when no other inmate signs up for the weekly service, at least in the absence of a fulltime Buddhist chaplain, and argues Defendants have acted in bad faith by assuring him during the pendency of this action that access to the chapel would improve but there has been no improvement.  (ECF No. 37 at 7-8.)  However, the weekly chapel access records submitted by Defendants show that of the last 46 weeks of those records, from June 12, 2018, to April 29, 2019, beginning after Plaintiff initiated this action on March 22, 2018, services were held 40 times and cancelled 6 times: twice for holidays, twice for "no service," and once each due to weather and "no program."  (ECF No. 45-5 at 96-141.)  Thus, for nearly a year after this action was filed there were at most only 3 cancellations for lack of a supervisor.

Plaintiff has not come forward with evidence that the failure to hire a Buddhist chaplain or arrange for a fulltime supervisor is necessary to ensure weekly services are not cancelled, has failed to refute Defendants' evidence that no Defendant to this action had the authority to hire a fulltime Buddhist chaplain or direct CDCR staff to attend services when no supervisor was available, and has failed to present evidence he was "denied all means of religious expression" by the Defendants when chapel services were cancelled, as opposed to being required to hold services under less than ideal conditions.  Even assuming the failure to hire a fulltime Buddhist chaplain precluded Plaintiff from discussing the dharma during weekly services with a chaplain, which in any case no Defendant to this action was authorized to hire, the record is sufficient to show Plaintiff "retained the ability to participate in other significant rituals and ceremonies of [his] faith," *id*, which he identifies in his Complaint as "mandatory meditation, chanting, and prostration indoors."

(ECF No. 1 at 10.)  Plaintiff has not shown he did not have some alternative means of practicing his faith, nor is there any evidence showing he was "denied all means of religious expression."  *Ward*, 1 F.3d at 877.

Accordingly, Defendants have, and Plaintiff has not, come forward with evidence that when weekly services were cancelled for lack of a supervisor Plaintiff was free to hold services on the yard or indoors in the housing unit by himself or with other Buddhist inmates and participate in most if not all of his religious observances.  The Court finds no triable issue of fact exists to show Plaintiff was deprived of "all forms of religious exercise," during the time that group chapel services were unavailable.  *O'Lone*, 482 U.S. at 352-53; *see also Mayweathers v. Newland*, 258 F.3d 930, 938 (9th Cir. 2001) (noting that "although there is no substitute for attending Jumu'ah services, the absence of alternatives does not require a holding in favor of the inmates [if] they 'retain the ability to participate in other Muslim religious ceremonies'" (quoting *O'Lone*, 482 U.S. at 352)). The second *Turner* factor therefore also weighs in favor of the Defendants.

The third *Turner* factor requires examination of the impact the accommodation of Plaintiff's request "will have on guards and other inmates, and on the allocation of prison resources generally."  *Turner*, 482 U.S. at 90; *Shakur*, 514 F.3d at 886.  In evaluating this factor, the Court may consider security concerns, as well as whether the "appearance of favoritism . . . could generate resentment and unrest."  *Standing Deer v. Carlson*, 831 F.2d 1525, 1529 (9th Cir. 1987); *McCabe v. Arave*, 827 F.2d 634, 637 (9th Cir. 1987). Defendants have presented evidence that all chapel services are subject to the same cancellation policies at RJD.  Although Plaintiff contends Buddhism at RJD is less favored than other religions, primarily because it does not have a fulltime chaplain, the perception of favoritism  "is not in itself dispositive," because it "is present in every case that requires special accommodations for adherents to particular religious practices."  *Ward*, 1 F.3d at 878; *see Pierce v. Cty. of Orange*, 526 F.3d 1190, 1211 (9th Cir. 2008) (finding denial of group worship for segregated detainees required individualized assessment of the circumstances and not blind deference to a "bare invocation of security concerns").

Plaintiff contends that "mainstream" religions are treated better because they have fulltime chaplains whose attendance means weekly religious services are rarely cancelled for lack of supervision, and Defendants have not explored alternatives for Buddhists to be similarly allowed to fully exercise their First Amendment rights.  (ECF No. 37 at 11-12, 21-23.)  However, the evidence in the record shows Defendant Brown sought to recruit Buddhist volunteers to supervise weekly services from the community, from the other RJD chaplains and from among the inmates, but did not have authority to hire a chaplain or require inmates or CDCR staff to supervise the weekly Buddhist services.  Defendants further attest that it is the Warden, who is not a Defendant, who has the authority to hire a fulltime Buddhist chaplain.  Although there is no specific evidence in the record regarding the financial impact hiring a fulltime Buddhist chaplain would have on the resources of RJD, Defendants have presented evidence that cancelling weekly services when fewer than three inmates sign up is an efficient use of RJD resources, and that requiring a supervisor at all chapel services is necessary for institutional security.  Thus, what evidence there is in the record as to the third *Turner* factor favors Defendants.  But even if Plaintiff could show this factor leans in his favor due to the lack of more specific evidence in the record as to what effects hiring a fulltime Buddhist chaplain or requiring RJD staff to supervise chapel services when a volunteer is unavailable would have on the allocation of RJD's resources, it is clearly outweighed by the other *Turner* factors.

Under the final *Turner* factor, the Court must consider whether genuine issues of material fact exist to show there were ready alternatives which would have accommodated Plaintiff at a de minimis cost.  *Ward*, 1 F.3d at 879; *see Turner*, 482 U.S. at 90-91 (the existence of alternatives may be "evidence that the [policy] is not reasonable but is an 'exaggerated response' to prison concerns").  Defendants do not bear the burden of disproving the availability of alternative accommodations in order to defend a First Amendment free exercise claim.  *O'Lone*, 482 U.S. at 350.  Instead, the burden is on Plaintiff to disprove Defendants' asserted rationale, *i.e.*, Plaintiff must point to evidence in the record which shows either that additional correctional staff was not required, or that the

cost of providing that staff would be "de minimis." *See Ward*, 1 F.3d at 879.

Plaintiff has failed to carry his burden in this respect.  First, he indicates that in the absence of hiring a fulltime Buddhist chaplain, RJD staff should be reallocated to supervise chapel services when a supervisor is unavailable, which he contends in a conclusory manner without supporting evidence would result in a de minimis cost.  (ECF No. 37 at 11-12.)  Defendant Brown, on the other hand, presents evidence he tried to recruit volunteer supervisors from RJD inmates, and by reaching out to the community and the other RJD chaplains.  Plaintiff requests RJD hire a full-time Buddhist chaplain or reallocate staff to ensure there always is a supervisor available so that services can always be held in the chapel, despite the evidence in the record that not all cancellations took place as a result of a lack of a supervisor or any evidence in the record supporting his contention that costs would be de minimis, and despite the fact there has been no showing of a substantial burden to the exercise of his religious practices when chapel services were cancelled.  Without more, the Court cannot conclude that Plaintiff has carried his burden of showing that additional correctional staff was not required or that the cost of providing that staff would be "de minimis," *Ward*, 1 F.3d at 879, or that Defendants' decision to require a supervisor for chapel service without expending resources to ensure one but instead relying on volunteers is an "exaggerated response" to their legitimate penological interests.  *Turner*, 482 U.S. at 90-91; *O'Lone*, 482 U.S. at 353.

In sum, having reviewed the record and evaluated the evidence in light of the *Turner* factors, the Court finds that the Defendants have carried their burden on summary judgment of coming forward with evidence establishing the existence of legitimate penological justifications which are rationally related to policies which have resulted in occasional cancellation of weekly Buddhist chapel services and which have not imposed a substantial burden on the free exercise of Plaintiff's religious practices.  Plaintiff has failed to carry his burden in support of his summary judgment motion, or in opposition to Defendants' motion, of pointing to evidence in the record sufficient to create a genuine issue for trial with regard to his First Amendment claim.  *See Beard v. Banks*, 548 U.S. 521, 525 (2006)

18cv0600-WQH (JLB)

(affirming summary judgment on prisoner's First Amendment claim where he failed to set forth "specific facts" that, in light of the deference that courts must show to the prison officials, warrant a determination in his favor"); Fed. R. Civ. P. 56(c).  Accordingly, the Court **GRANTS** summary judgment in favor of Defendants as to Plaintiff's First Amendment free exercise claim and **DENIES** Plaintiff's Motion for Summary Judgment as to that claim.

## V.   RLUIPA Claim

"The Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. §§ 2000cc *et seq*., requires the government to meet a higher burden of proof than the rational basis standard of *Turner*."  *Pierce*, 526 F.3d at 1209 n.19.  "Recognizing the significance of religious freedom in all aspects of life, Congress passed . . . RLUIPA to 'protect[ ] institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion.'"  *Khatib v. Cty. of Orange*, 639 F.3d 898, 900 (9th Cir. 2011) (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 721 (2005)).

RLUIPA prevents states from imposing "a substantial burden on the religious exercise of a person residing in or confined to an institution" unless the state can establish that imposing the burden "is the least restrictive means" of furthering "a compelling governmental interest."  *Id.* (citing 42 U.S.C. § 2000cc-1(a)).  In analyzing a RLUIPA claim, the court "must begin by identifying the 'religious exercise' allegedly impinged upon."  *Greene v. Solano Cty. Jail*, 513 F.3d 982, 987 (9th Cir. 2008).  Next, the court asks "whether the prison regulation at issue 'substantially burdens' that religious exercise."  *Id*. RLUIPA "mandates a stricter standard of review for prison regulations that burden the free exercise of religion than the reasonableness standard under *Turner*."  *Shakur*, 514 F.3d at 888.  A burden is "substantial" under RLUIPA where the state "denies an important benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs."  *Id*.  Under RLUIPA, Plaintiff "bears the initial burden of going forward with evidence to demonstrate a prima facie claim

that the [challenged state action] constitutes a substantial burden on the exercise of his religious beliefs." *Warsoldier v. Woodford*, 418 F.3d 989, 994 (9th Cir. 2005).

If Plaintiff establishes a "substantial burden," Defendants must then establish that the act or decisions which substantially burdened his religious exercise further a compelling governmental interest by the least restrictive means. *Greene*, 513 F.3d at 988; *Shakur*, 514 F.3d at 889. "[P]rison security is a compelling state interest, and . . . deference is due to institutional officials' expertise in this area." *Cutter*, 544 U.S. at 725 n.13. In order to carry their burden, "prison officials [cannot] justify restrictions exercise by simply citing to the need to maintain order and security," *Greene*, 513 F.3d at 889-90, but must show that they "actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice." *Warsoldier*, 418 F.3d at 999. "If prison officials meet that standard, the prison regulation passes muster under RLUIPA, regardless of the burden it imposes on religious exercise." *Greene*, 513 F.3d at 990.

Defendants claim the burden has not shifted to them because their conduct did not substantially burden the practice of Plaintiff's religion, as they provided Buddhist volunteers and weekly access to the chapel for Buddhist services, with cancellations occurring only one out of every three weeks on average for reasons such as holidays, weather, security, programming issues and lack of volunteers. (ECF No. 45 at 24-25.) As discussed above with respect to Plaintiff's First Amendment claim, the Court finds Defendants have shown Plaintiff is free to utilize indoor space in the housing unit or outdoor space on the yard to conduct services when chapel services are cancelled, as any religious adherents are free to do when their chapel services were cancelled for any reason, that cancelling chapel services when no supervisor is available serves important penological interests, and that no Defendant had the authority to hire a fulltime Buddhist chaplain or reallocate CDCR staff.[4]

---

[4] As set forth above, Plaintiff did not exhaust administrative remedies as to his claim that Defendants failed to provide food for bi-annual Buddhist holiday festivals.

In *Greene*, the Ninth Circuit explicitly held that an "outright ban on a particular religious exercise," specifically, a jail's policy prohibiting a maximum-security prisoner from attending group worship services, "substantially burdened his ability to exercise his religion" under RLUIPA. *Greene*, 513 F.3d at 988. However, the undisputed evidence here shows that no such outright ban exists. Instead, Defendants have presented evidence which shows that RJD policy merely requires supervision of group worship in the chapel, and that this requirement has resulted in lack of access to the chapel for group worship on average, at most, of once a month for the two and one-half year period of records submitted, and only 3 times in the most recent 46 months. Plaintiff has not satisfied his burden of showing Defendants' refusal to permit group service in the chapel when fewer than three inmates sign up or when a supervisor is not available, or to prevent cancellation for lack of supervision by hiring a fulltime Buddhist chaplain or reallocating CDCR staff substantially burdened his exercise of religion by pressuring him "to violate his beliefs." *Shakur*, 514 F.3d at 888; *Warsoldier*, 418 F.3d at 994; 42 U.S.C. § 2000cc-2(b).

Even if Plaintiff could make such a showing, the burden would be on Defendants to show their decision to restrict his religious practice to non-chapel service when the group is smaller than three or unsupervised was taken in furtherance of a compelling government interest and was the least restrictive means of furthering that interest. *Greene*, 513 F.3d at 988; *Shakur*, 514 F.3d at 889; 42 U.S.C. § 2000cc-1(a). Defendants claim, and undisputed evidence in the record is sufficient to show, they have a compelling government security interest in requiring chapel services to be supervised and in not reallocating resources to ensure a permanent supervisor is available even when less than three inmates sign up for services. *See Cutter*, 544 U.S. at 722, 725 n.13 (noting that there is no question that "maintain[ing] good order, security and discipline, consistent with consideration of costs and limited resources" is a compelling government interest); *Greene*, 513 F.3d at 988-89; *Warsoldier*, 418 F.3d at 998.

Defendants would also have the burden of showing their decision to restrict Plaintiff's ability to attend group services in the chapel when less than three inmates sign

up or when no supervisor is available was the "least restrictive means" by which they could achieve their goals under the circumstances. *Greene*, 513 F.3d at 989. Plaintiff argues the Defendants never considered alternative means of preventing cancellation of weekly chapel services for lack of a supervisor. The evidence in the record shows, however, that Defendant Brown, although he lacked the authority to hire a fulltime Buddhist chaplain or to require inmates or RJD staff to act as supervisors, nevertheless attempted to recruit volunteer supervisors through community outreach, by requesting referrals from the other RJD chaplains, and by soliciting assistance from RJD inmates. The record before this Court reveals no triable fact as to whether Defendants "actually considered and rejected the efficacy of less restrictive measures" before refusing Plaintiff's requests to hire a fulltime Buddhist chaplain or reallocate staff to ensure no chapel services were never cancelled due to lack of a supervisor or insufficient interest by other inmates. *Greene*, 513 F.3d at 889. Undisputed evidence in the record before this Court shows they did; thus, "the prison regulations passes muster under RLUIPA, regardless of the burden it imposes on [Plaintiff's] religious exercise." *Id*. at 990. This case does not present a situation where prison officials "simply cit[ed] the need to maintain order and security in a prison" in order to blankly justify a restriction on an inmate's religious exercise. *Cf.*, *Greene*, 513 F.3d at 889-90; *Warsoldier*, 418 F.3d at 998. Defendants are entitled to summary judgment even under RLUIPA's least-restrictive means test. *See* 42 U.S.C. § 2000cc-1(a).

Accordingly, as to Plaintiff's RLUIPA claim, the Court **GRANTS** summary judgment in favor of Defendants and **DENIES** Plaintiff's Motion for Summary Judgment.

## IV.   IMPROPER DEFENDANTS

Defendants also contend summary judgment is appropriate as to Defendant Brown with respect to any ongoing violations because he has retired, as to Defendants Covello and Davies because they cannot be held liable merely for their involvement in the inmate appeal process, and as to Defendant Chaplain Hadjadj because he did not have the authority to provide Plaintiff relief. (ECF No. 45 at 16-17.) Because the Court has granted summary judgment as to these Defendants, it does not reach these contentions.

## V.     Qualified Immunity

Finally, Defendants argue they are entitled to qualified immunity with respect to the First Amendment and RLUIPA claims.  Because the Court has found no triable issue of fact exists to show Plaintiff's free exercise rights were violated under the First Amendment or RLUIPA, it need not reach Defendants' claim of qualified immunity.  *See Saucier v. Katz*, 533 U.S. 194, 201 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009); *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998) ("[T]he better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged the deprivation of a constitutional right at all.").

## VI.     Conclusion and Order

Based on the foregoing, **IT IS ORDERED** that Plaintiff's Motion for Summary Judgment (ECF No. 37) is **DENIED** and Defendants' Motion for Summary Judgment (ECF No. 45) is **GRANTED** in part and **DENIED** in part as set forth herein.  Summary Judgment is **GRANTED** in favor of Defendants as to Plaintiff's First Amendment and RLUIPA claims, the only remaining claims in the Complaint.  The Clerk of Court shall enter judgment in favor of Defendants and close the file.

**IT IS SO ORDERED.**

Dated:  September 3, 2020

Hon. William Q. Hayes
United States District Court

18cv0600-WQH (JLB)